1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  PANGEA CAPITAL MANAGEMENT,
   LLC,
4
                Petitioner,
5
            v.                          16 Civ. 840 (LAK)
6
   JOHN R. LAKIAN,
7
                Respondent.
8
   ------------------------------x
9                                  New York, N.Y.
                                   February 4, 2016
10                                 2:15 p.m.

11 Before:

12                 HON. LEWIS A. KAPLAN,

13                                      District Judge

14                      APPEARANCES

15 INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI
        Attorneys for Petitioner
16 BY:  EVAN R. RACITI
        CAITLIN L. BRONNER
17

18 ALSO PRESENT:  RICHARD E. CARMEN
                  JUDITH R. RICHMAN
19                BRAD E. SERLEN
                  ROGER L. STAVIS
20

21

22

23

24

25

1                (Case called)

2                MR. RACITI:  Evan Raciti for plaintiff.

3                THE COURT:  Thank you.

4                MR. CARMEN:  Your Honor, I'm Richard Carmen.  Our firm

5     was counsel for Mr. Lakian in the underlying arbitration.

6     However, I'm appearing here as a courtesy.  We have not been

7     retained and engaged for the proceeding to confirm.  But I'm

8     before the Court.  I received the papers from Mr. Raciti last

9     night.  As I understand, I was directed by your Honor.

10               THE COURT:  We will come back to that.

11               MS. RICHMAN:  We are here on behalf of Andrea Lakian,

12    who is not a defendant, but this is her home that they are

13    seeking to attach.

14               MR. STAVIS:  Roger Stavis of the firm of Gallet Dreyer

15    & Berkey.  I'm here representing Ms. Lakian as well and my role

16    in representing Ms. Lakian was that I was forfeiture counsel in

17    the Eastern District case where the piece of property that's

18    the subject of these proceedings is subject to a forfeiture in

19    the Eastern District.  So I'm forfeiture counsel in the Eastern

20    District case.

21               THE COURT:  Let me come back to what Mr. Carmen had to

22    say.  Looking around here for my copy of the local rules, the

23    thought running through my mind is that a lawyer is either in

24    the case or not in the case.  And I understand your quandary,

25    not having been retained.  I practiced law for a long time and

1    I'm very sympathetic.

2              Are you saying you have authority to appear?  Strike

3    the word appear because it's a term of art.  Authority to act

4    on behalf of Mr. Lakian here today anyway, or not?

5              MR. CARMEN:  Your Honor, if that means that I would be

6    appearing, the answer is no, I do not, and my firm does not.

7              THE COURT:  Other than the fact that you are

8    representing him in the criminal case.

9              MR. CARMEN:  Our firm is not representing him in the

10   criminal case.  We represented him in the arbitration before

11   JAMS.

12             THE COURT:  Other than that coincidence and given that

13   you are not prepared to tell me that you have authority to act

14   on his behalf today, why should I hear you at all?

15             MR. CARMEN:  Other than to be informational, your

16   Honor, and just say that Mr. Lakian is seeking counsel for this

17   case.  I can tell your Honor that.

18             THE COURT:  You basically came as a courtesy to me to

19   convey that information.

20             MR. CARMEN:  Yes.

21             THE COURT:  Now, so far as Ms. Richman and Mr. Stavis

22   are concerned, you are authorized to act for your client,

23   right?

24             MS. RICHMAN:  Correct, your Honor.

25             MR. STAVIS:  Yes, your Honor.

1          THE COURT:  And your problem is she is not a party

2    here.

3          MR. STAVIS:  That's correct, your Honor.

4          MS. RICHMAN:  Correct, your Honor.

5          THE COURT:  Inasmuch as this is an application for a

6    TRO and very expedited relief, I'll hear you today.  But you

7    are going to have to obtain, whether on consent or otherwise,

8    intervention and become a party if you are to participate

9    further beyond today because nonparties don't get to be heard.

10   But I'll hear you today.

11         MS. RICHMAN:  Thank you, your Honor.

12         THE COURT:  I have a proposed order to show cause for

13   an order of attachment and a temporary restraining order.  I'm

14   just making a note on something I marked up yesterday.

15         I guess I will hear from Mr. Raciti.

16         MR. RACITI:  Thank you, your Honor.  Before I begin --

17         THE COURT:  The lecturn, please.

18         MR. RACITI:  We move for this order to show cause

19   because the defendant or respondent in this action is John

20   Lakian.  John Lakian has for the last several years perpetrated

21   a significant fraud against Pangea, the petitioner in this

22   action, and earlier this month, on February 2, an arbitration

23   award was entered for the amount of approximately 15 and a half

24   million dollars because of the fraudulent acts that Lakian

25   carried out at Pangea's expense.

1          In connection with the arbitration, after the

2     arbitration ended, Lakian was arrested by the FBI and indicted

3     on five felony counts related to his fraud against Pangea and

4     other victims.  He has a long history of fraudulent acts in

5     theory.  It's a major concern for petitioner that the last

6     remaining asset of Mr. Lakian's will be dissipated, it will be

7     sold, encumbered or conveyed for no consideration, as he has

8     done several times in the past.

9          Immediately after petitioners filed their action

10    against Mr. Lakian, he conveyed a substantial property to a

11    trust in his name and to that of his mistress, Ms. Lamm, and

12    coconspirator, for no consideration.

13         THE COURT:  What was the date that occurred?

14         MR. RACITI:  That occurred five days after the filing

15    of the arbitration in 2012.  I believe it was June -- the exact

16    date is in here, your Honor.

17         THE COURT:  Almost four years ago.

18         MR. RACITI:  Yes, your Honor.  Before the underlying

19    litigation, which led to the arbitration beginning, he owned

20    four properties.  Since that time he has sold or conveyed off

21    three of them.

22         THE COURT:  When most recently?

23         MR. RACITI:  The most recent was in 2014 where he sold

24    a 17 North restaurant for 2.5 million, which was a property

25    that was actually a part of the underlying award due to certain

 1    misconduct in that action.

 2            THE COURT:  I don't understand what that means.  It's

 3    a property that was part of the underlying award.  What does

 4    that mean?

 5            MR. RACITI:  Let me take a step back.  I don't want to

 6    get into the nitty gritty of the award if I don't have to.  I

 7    may misspeak with what the award says.  It did have relevance

 8    to how he acquired the property using misappropriated funds,

 9    your Honor.  I don't want to misspeak and get into it.

10    Nonetheless, he has dissipated all but one asset, which is the

11    Shelter Island property.

12            THE COURT:  The third property, that's the one in

13    which you are complaining of something that happened about two

14    years ago.

15            MR. RACITI:  Correct.  So the first property was the

16    one that he basically gave away to a trust that he controls.

17    The second one was a property which he sold for $405,000 on

18    August 30, 2012, which was about two months after our action

19    began.

20            THE COURT:  The point of my question is this, that

21    you've come running in here seeking a highly expedited relief

22    starting with an ex parte application yesterday and you have

23    not, I think, pointed to anything that's happened anything more

24    recently than two years ago, right?

25            MR. RACITI:  The major development that's happened in

1    the last two years has been the listing of the Shelter Island

2    home and then the rapid decrease in the price of the listing

3    asking price.  It was listed for around $18 million and has

4    been decreased to $11.75 million today.  There is a clear

5    urgency on the part of Mr. Lakian to dispose of the property.

6    And in light of the fact that he was just indicted on the

7    criminal charges and he has got a massive award against him --

8           THE COURT:  Is there any information about what the

9    fair market value of the property is?

10          MR. RACITI:  I don't have that available, your Honor.

11          THE COURT:  Suppose it's worth 10 million.

12          MR. RACITI:  I can't speak to how much its fair value

13   is.  I can say that the timing of the decrease in price

14   correlating to his indictment and pending his trial is

15   scheduled for May 1.  He is facing serious felony charges, not

16   to mention a 15 and a half million dollar award against him,

17   which we hope, your Honor, will confirm in this underlying

18   petition to confirm.  It's very likely he is trying to sell his

19   asset as quickly as possible.  And just based on history of bad

20   behavior, we are very worried that he is going to then get rid

21   of the asset.  All we are asking for is for him not to be

22   permitted to sell the asset at this time.

23          THE COURT:  What is the ground on which you seek an

24   order of attachment under 6201?

25          MR. RACITI:  The 6201 would be the ground for

1   subsection 3, which is the basis for his attempts to frustrate

2   any eventual judgment obtained by petitioner.  So we have

3   significant case law showing that someone who has done much

4   less wrongdoing in fraudulent acts than Mr. Lakian would

5   qualify under that ground.

6         Moreover, we could even substitute 6201(3) with CPLR

7   7502, which is in aid of arbitration.  We have obtained an

8   award and we believe that without an order of attachment, it

9   can be rendered ineffectual, which would be under 7502(c).

10        THE COURT:  Give me a moment to look at that.  It says

11  that the Court may entertain an application for an order of

12  attachment, but only upon the ground that the award to which

13  the applicant may be entitled may be rendered ineffectual

14  absent that relief.  The provisions of articles 62 and 63

15  apply.  So to me, and correct me if you have a different view,

16  that means that in construing 6201(3), I'm to regard an

17  arbitration award as the equivalent of a judgment, but,

18  otherwise, the provisions of article 62 apply, including the

19  requirement of a likelihood of success on the issue of intent

20  to frustrate enforcement.

21        MR. RACITI:  I believe your Honor is correct that the

22  7502(c) provision effectively replaces 6201(3) as the ground,

23  statutory grounds --

24        THE COURT:  It actually says the opposite.  What it

25  says is that article 62 applies?

1          MR. RACITI:  Yes.  The case law, however, interprets

2     it as saying that the grounds under Article 62, such as having

3     to show a likelihood of success on the underlying claim, which

4     here would be the petition to confirm the award and showing the

5     other requirements, such as likelihood of success, and that

6     there aren't any counterclaims greater than our main claim.

7          THE COURT:  Is it your position that the likelihood of

8     success that you have to show is only that it's likely that the

9     award will be confirmed or do you have to show that plus a

10     likelihood of success on intent to frustrate enforcement?

11          MR. RACITI:  I believe it's just on the fact that we

12     are going to win the underlying claim.  From what I've seen in

13     the case law, we are going to get a judgment based on our

14     petition to confirm, and this is a prejudgment attachment

15     mechanism.  What we have to show is, we are going to get a

16     judgment and that is why we are moving for prejudgment

17     attachment.

18          THE COURT:  Don't you have to show an intention to

19     frustrate enforcement?

20          MR. RACITI:  Yes, your Honor.  I think under 6201(3),

21     which is independent of the in aid of arbitration under

22     7502(c), we do show an intent to frustrate.  I'll give you an

23     example, your Honor.  One moment.

24          The facts of this case are extraordinarily similar to

25     that of Mineola Ford Sales Limited v. Rapp, which is a Second

1   Department case.  There the Second Department affirmed an order

2   of prejudgment attachment entered by the Supreme Court on the

3   grounds that the CPLR 6201(3) was satisfied where the

4   defendant, while an employee of the --

5           THE COURT:  It's really not too helpful to me,

6   particularly at a high rate of speed.

7           MR. RACITI:  Pardon, your Honor.  The takeaway, the

8   long and short of it is, we have sufficient grounds for showing

9   that we satisfy the grounds under 6201(3) candidly.  We have an

10  actor who has committed several systematic acts of fraud

11  against our client specifically and then, on top of that, he

12  has fraudulently conveyed properties after our litigation

13  began, and all evidence points to the fact that he is

14  attempting to sell the property at issue.

15          THE COURT:  Let me just explore that for a minute to

16  make sure we have covered all the bases.  The attempt to

17  defraud your client after the arbitration commenced, what were

18  the acts?  One was the transfer to the trust, right?

19          MR. RACITI:  Yes.  I would say that's the most blatant

20  of the acts.

21          THE COURT:  It's a trust revocable by him, right?

22          MR. RACITI:  The trust of that transfer, it was

23  revocable by him, but I would like to like to clarify that it

24  is not -- yes.  Let me just strike that, your Honor.  It was

25  revocable by him, correct.

```
 1              THE COURT:  Wouldn't the res of the trust, revocable
 2     by the judgment debtor, be available to satisfy the judgment?
 3              MR. RACITI:  I believe that is correct, your Honor.
 4              THE COURT:  So there is nothing about the transfer to
 5     the trust, given that it's revocable by him, that in any way
 6     impeded you as a potential judgment creditor, isn't that right?
 7              MR. RACITI:  In actuality you are correct.
 8              THE COURT:  I try to stay in the plane of actuality.
 9              MR. RACITI:  The point I would make is the attempt to
10     defraud may not have been realized, even though there was an
11     attempt.
12              THE COURT:  If the transfer of the trust didn't put
13     the property beyond the reach of a judgment creditor, by what
14     stretch of the imagination do you say it was an intent to
15     defraud?
16              MS. BRONNER:  Your Honor, if I may, my name is Caitlin
17     Bronner.  I'm the partner who handled the underlying
18     arbitration.  If I might be heard, I can hopefully address your
19     Honor's question.
20              THE COURT:  This will be a rare exception, but go
21     ahead.  I don't believe in tag team arguments.
22              MS. BRONNER:  I understand, your Honor, and I
23     appreciate your Honor's understanding in this regard.
24              There are two trusts at issue here, your Honor.  One
25     trust is the Gems II Realty trust, which is the trust that owns
```

1    the property on Shelter Island that is the subject of this

2    underlying request for TRO and attachment.  The trust to which

3    my colleague was referring is the Double L Lodge Realty Trust,

4    the trust of which it is our understanding that Mr. Lakian and

5    his mistress, Diane Lamm, are the trustees.  Diane Lamm was a

6    party to the underlying arbitration.

7            THE COURT:  What was the property transferred to the

8    LL Trust?

9            MS. BRONNER:  The LL Trust, that was Mr. Lakian and

10   Ms. Lamm's primary residence in North Carolina.  The property

11   located at Eagle Ridge Drive in North Carolina.

12           THE COURT:  Is that trust revocable by Mr. Lakian?

13           MS. BRONNER:  I don't know the answer to that, your

14   Honor, unfortunately.  We have not seen the underlying trust

15   instrument.  It wasn't provided.  To finish the thought, your

16   Honor, Ms. Lamm filed for bankruptcy protection during the

17   course of the arbitration.  To the extent that the property was

18   transferred to a trust that we believe is controlled by

19   Ms. Lamm, among others, Ms. Lamm is now out of the arbitration

20   and, therefore, is not a party to the award.  The award is only

21   against Mr. Lakian.

22           Thank you, your Honor.  I believe my colleague will

23   continue.

24           THE COURT:  Just to finish the thought, if that trust

25   is revocable by Mr. Lamm, then the transfer of the North

1   Carolina property did nothing to frustrate any creditor or

2   potential creditor, right?

3        MS. BRONNER:  Well, it is our position, your Honor,

4   that, again, the conveyance of the property to a mutual trust

5   three days after the commencement of the antecedent state court

6   litigation, in our view, insulated from attachment.  Again, I

7   can't speak to whether it was revocable or irrevocable, but it

8   was our belief that it was done to frustrate creditors, such as

9   Pangea.

10        MR. RACITI:  I apologize for the tag team.  One thing

11  I did say, it was revocable is because it was revocable.

12  Exhibit D to the order to show cause affidavit includes a copy

13  of the trust documents which says --

14        THE COURT:  For which trust?

15        MR. RACITI:  For the Double L fund trust that's at

16  issue.  I can read it.  The trust agreement reads:  "The trust

17  is revocable.  The persons holding the power to revoke or amend

18  the trust is John Lakian and Diane Lamm."

19        THE COURT:  That's on what page?

20        MR. RACITI:  It appears to be the ninth page of the

21  Exhibit D.

22        THE COURT:  There are little page numbers at top of

23  the pages.  What page number?

24        MR. RACITI:  It says page 2065 on the top left, your

25  Honor.

 1          THE COURT:  The persons, plural, holding the power to

 2   revoke or amend the trust is, singular, John Lakian and Diane

 3   Lamm.

 4          Now, does anybody pay attention to the question of

 5   whether under the governing law, which maybe is North Carolina,

 6   I suppose, although I don't know, such a provision makes the

 7   trust revocable by either of those individuals or must they act

 8   together?  And it matters a lot, doesn't it?

 9          MR. RACITI:  In this particular instance, absolutely,

10   your Honor, it does matter a lot in this particular trust,

11   unlike the trust that currently holds the property at Shelter

12   Island, which only John Lakian is the only sole trustee and has

13   the sole power to revoke.  So there I don't believe there is

14   any question.

15          In this instance, however, your Honor, I think your

16   point is well taken.  Just because he may have failed at

17   frustrating the judgment doesn't mean he didn't attempt it, as

18   his course of dealings prior to and after show.

19          THE COURT:  I understand that argument.  I do.

20          One alleged act of fraud is the transfer to this North

21   Carolina trust.  Is there any other?

22          MR. RACITI:  After that, about a month or two after

23   that, in August of 2012, he then sold a second property and

24   thereafter, about a year and a half later, in February 2014, he

25   sold the 17 North restaurant property, basically liquidating

 1    all his properties --

 2            THE COURT:  The 2012 transfer was of what, another

 3    peace of real estate?

 4            MR. RACITI:  Yes, your Honor.

 5            THE COURT:  What happened to the proceeds?  Do you

 6    know?

 7            MR. RACITI:  We do not know, your Honor.

 8            THE COURT:  Then there is a 2014 restaurant sale.  Do

 9    you know what happened to the proceeds?

10            MR. RACITI:  We do not, your Honor.

11            THE COURT:  Anything else?

12            MR. RACITI:  The final ground.  We have could have had

13    likelihood of success.  I could cover that, but I don't think

14    it requires much emphasis, your Honor.  Clearly, this is a

15    petition to confirm an arbitration award, which was a 180-page

16    award that was entered after 12-day arbitration before --

17            THE COURT:  Before justice Stephen Crane.

18            MR. RACITI:  We think it would be highly unlikely that

19    this would not get affirmed.

20            With respect to the balance of equities in this case,

21    we have plain and simple a fraudster on one hand and then his

22    victim on the other.  We think that the TRO we are requesting

23    will be short in nature and that the order of attachment is

24    completely justified, given that a judgment should be soon

25    entered by this court, and there will be no material harm

1    caused by a TRO of such a short nature.  We think that the

2    equity clearly favors petitioners here, your Honor.  We think

3    this is the perfect -- this is a case, the perfect case where

4    prejudgment attachment is appropriate, where you have someone

5    with a history of concealing assets, defrauding individuals,

6    and just claimed dishonesty who is currently in the process of

7    attempting to sell his last remaining asset.  So we hope your

8    Honor sees our point of view.  That's all I have.

9            THE COURT:  I understand your point of view.  Thank

10   you.

11           MR. RACITI:  Thank you, your Honor.

12           THE COURT:  Who is next?

13           MR. STAVIS:  If the Court please, I'm Roger Stavis and

14   I was retained to be forfeiture counsel for Andrea Lakian, the

15   wife of John Lakian, because John Lakian was indicted in

16   indictment 15 Cr. 0043 in the Eastern District in a case

17   pending before Judge Block.  There are two forfeiture counts in

18   that indictment.  So my role was to work with the Assistant

19   United States Attorney in the Eastern District whose name is

20   Whitman Knapp, III.

21           THE COURT:  Probably a pretty good lawyer, judging by

22   the genes.

23           MR. STAVIS:  Excellent lawyer.  And the residence on

24   Shelter Island was the big item for the forfeiture.  Mr. Knapp

25   is aware that this residence on Shelter Island was purchased in

1   2002, before the fraud, before the plaintiff was bringing

2   lawsuits.  And then, because Mr. Knapp was aware of it, the

3   parties were engaged in a divorce proceeding.  The divorce

4   became final in June of last year, June 2015.  And Ms. Lakian

5   was awarded 62 and a half percent of the residence on Shelter

6   Island that the plaintiff is seeking an order of attachment

7   for.

8            As far as Mr. Lakian, who is out on bond and subject

9   to strict pretrial release dissipating that asset, your Honor,

10  this is the most scrutinized piece of property that you could

11  possibly conceive of.  It's the subject of a forfeiture and

12  it's on the radar scene for forfeiture of the United States

13  Attorney for the Eastern District of New York.  It cannot be

14  sold by John Lakian because Andrea Lakian has a 62.5 percent

15  interest in this property --

16            THE COURT:  The title to the property is in this Gems

17  II trust, right?

18            MR. STAVIS:  Correct, your Honor.

19            THE COURT:  When somebody goes to do a title search

20  that's what's going to pop up, correct?

21            MR. STAVIS:  Presumably.

22            THE COURT:  So the 62 and a half percent that

23  Ms. Lakian was awarded by the matrimonial court, in what form

24  is that interest?

25            MR. STAVIS:  The matrimonial attorney, Ms. Richman, is

1    here to answer questions specific to the matrimonial for the

2    Court.  We have the judgment.

3              THE COURT:  It sort of matters because it sounds to

4    me, although maybe I'm wrong because I don't know the first

5    thing about matrimonial law, it sounds to me that the fee

6    simple of the property is held free and clear by this Gems II

7    trust and that it may well be that Ms. Lakian has been awarded

8    an interest in the trust.  And whether that's taken effect yet

9    or hasn't taken effect, I have no idea.  And I'm just testing

10   your assertion that she has an interest in the real estate,

11   which, as a practical matter, may in a way be true.  I am not

12   sure it's true, maybe it is, that she has got an interest in

13   the real property per se.

14             MR. STAVIS:  Yes, your Honor.  The question about the

15   specifics of the matrimonial --

16             THE COURT:  And the title to the property.

17             MR. STAVIS:  -- and the title to the property,

18   Ms. Richman can speak to.

19             THE COURT:  I'll be happy to hear from her.

20             MS. RICHMAN:  Thank you, your Honor.  I am Judy

21   Richman representing Andrea Lakian.  Our firm is representing

22   her in the matrimonial action.  The Gems II trust, which was

23   created in 2002, when they purchased the home as the result of

24   a sale of the former home, was taken in a nominee trust, and at

25   that point John Lakian --

1          THE COURT:  Gems II is the nominee trust.  Is that

2     what you are saying?

3          MS. RICHMAN:  Correct.  And John Lakian, Ms. Lakian's

4     former husband, and Andrea Lakian are listed as the

5     beneficiaries, as the owners on equal terms of 50 percent.

6          THE COURT:  They are 50/50 beneficiaries of the trust,

7     correct?

8          MS. RICHMAN:  Correct.  And of the property.

9          THE COURT:  I don't understand how that works.

10         MS. RICHMAN:  Because it's a real estate trust.  It's

11    a nominee trust.  So, therefore, they are the true owners of

12    the property.

13         THE COURT:  You are probably way down the road in

14    learning on this than I am.  I am sure you are.  But I would

15    have thought that the whole purpose of a trust is so that the

16    legal ownership of the real estate is in the trust and

17    therefore in the trustee, right, and that the beneficiaries for

18    whom the trustee holds as nominee are the Lakians.  Is that the

19    structure?

20         MS. RICHMAN:  That's the structure.

21         THE COURT:  They don't have a legal, as distinguished

22    from beneficial, interest in the real estate.  What they have

23    is a beneficial interest in the trust which holds the real

24    estate.

25         MS. RICHMAN:  Correct.  If the trust --

```
 1              THE COURT:  If the trust were unwound.

 2              MS. RICHMAN:  They would each own it as tenants in

 3    common on an equal basis.  That was changed in the matrimonial

 4    case when Andrea Lakian received 62 and a half percent of the

 5    property for which she gave up enormous other rights, and

 6    Mr. John Lakian has 37 and a half percent of the property.

 7              THE COURT:  And this is the trust in which John Lakian

 8    has the right unilaterally to revoke.  Is that correct, or not?

 9    Do I mistake that?

10              MS. RICHMAN:  I think the trust says can be terminated

11    at any time by the beneficiaries.  That's a plural, which would

12    be John Lakian and Andrea Lakian.

13              THE COURT:  Where in the record do I find that trust

14    instrument, if at all?

15              MS. RICHMAN:  Exhibit G, your Honor.

16              THE COURT:  Thank you for that.  And the provision you

17    are looking at, Ms. Richman, is where?

18              MS. RICHMAN:  I'm just looking on page 4, your Honor.

19    It says the trust may also be revoked and terminated by all of

20    the then trustees.

21              THE COURT:  And John Lakian is the sole trustee.

22              MS. RICHMAN:  John Lakian is the sole trustee at this

23    time.  And if it were terminated, then the asset would reside

24    62 and a half percent in Andrea Lakian's name and 37 an a half

25    percent in her former husband's name, John Lakian.
```

1          THE COURT:  If you are representing the buyer of the

2     real estate, hypothetical buyer, and you find title in the

3     trust, the title company will remand the trust instrument, the

4     trust instrument will show that Lakian has the right to convey

5     the property because Lakian is the sole trustee.  We agree so

6     far?

7          MS. RICHMAN:  Yes.

8          THE COURT:  Therefore, the prospective buyer would be

9     presumably free and clear if he writes a check to John Lakian

10    in his capacity as trustee of the Gems II trust, and John

11    Lakian can deliver clear title to the property and the sale

12    happens.  And then John Lakian as trustee has a pot of money

13    and, in theory, by virtue of the divorce judgment or agreement,

14    settlement agreement, 62 and a half percent of that pot of

15    money belongs to your client.  Is that it?

16         MS. RICHMAN:  Yes.  I am not sure by the terms of the

17    trust he could sell it without Ms. Lakian's approval.

18         THE COURT:  Fair point.  I have not read it all the

19    way through either.

20         MS. RICHMAN:  The judgment certainly requires that and

21    there is also --

22         THE COURT:  The judgment --

23         MS. RICHMAN:  The judgment of divorce.

24         THE COURT:  Requires what?

25         MS. RICHMAN:  That it has attached to it the

1    settlement agreement which requires Ms. Lakian's approval on

2    any sale, and there is also, as Mr. Stavis said, there is the

3    forfeiture.

4         THE COURT:  The forfeiture is an allegation in the

5    indictment.  That's all that is.  That is not an interest in

6    the real estate today.

7         MS. RICHMAN:  Correct.

8         THE COURT:  You are telling me the divorce judgment

9    has attached to it a settlement agreement that requires

10    Ms. Lakian's consent for Lakian to sell.  Is that right?

11         MS. RICHMAN:  They are both to be apprised and they

12    are both listed.  They have both executed brokerage agreements

13    and they are both listed on such agreements for the sale of the

14    property.

15         THE COURT:  That's not the question I asked.

16         MS. RICHMAN:  I understand, your Honor.

17         THE COURT:  Let's pass that.  Let's assume that the

18    settlement agreement so provides.  How does a prospective buyer

19    know that there is a settlement agreement between the Lakians

20    and that it's been incorporated in a state court divorce

21    judgment somewhere when they run the title search?

22         MS. RICHMAN:  Your Honor, I am not sure at this point

23    that I know the answer to that other than there was a judgment

24    filed, and I see when they do a title search, they may --

25         THE COURT:  They look up the vendor/vendee index for

 1    the property and they trace back and -- I never did a title

 2    search in my life and I hope never to do one.  I'm pretty sure

 3    it's not going to be in my future.  My understanding of it is,

 4    you would never turn up a divorce judgment in doing a title

 5    search on a piece of real estate.  That's at least not what

 6    they taught me at law school.

 7          Let's pass over that.  Your client has a clear

 8    interest here.  Let's get to that.  I always just like to make

 9    sure I understand what's going on, the nitty gritty of what's

10    going on.

11          MS. RICHMAN:  To go back to the preceding acquisition

12    of the property, before Ms. Lakian and John Lakian acquired the

13    property in 2002, they did this by selling a former marital

14    residence.  This became their marital residence, long before

15    apparently Pangea ever met Mr. Lakian.  And thereafter there

16    was a divorce proceeding, quite a contentious divorce

17    proceeding, which was --

18          THE COURT:  I would guess that.

19          MS. RICHMAN:  Which was settled.  They had a great

20    deal of property.  Unfortunately, there is no longer a great

21    deal of property.  And my client, Andrea Lakian, who is the

22    true victim of anything that John Lakian did with Ms. Lamm, my

23    client had one asset left, which was her marital home.  That

24    marital home, as part of the divorce, was awarded through a

25    settlement confirmed by the matrimonial court filing the

judgment with 62 and a half percent plus $75,000 of the

property.  And therefore if there is going to be any

proceedings regarding the property and Mr. Lakian, it should

only be with respect to his interests, not Andrea Lakian's

interest in property which she has had for many years.  She was

married to Mr. Lakian for almost 40 years.  She has been

deprived of money.  She has been humiliated.  She has been hurt

in any number of ways.  This is all she has left.  She gave up

claims for waste of marital assets.  She gave up claims for

support.  She gave up claims for many, many things she was

entitled to for this little piece of the marital estate.  As I

say, this piece of the marital estate was acquired long before

any claims of Pangea ever came to light, long before, I

believe, Mr. Lakian ever met the people from Pangea.

          Anything that is done in this case with respect to

Pangea and John Lakian should not in any way prohibit my client

from receiving the proceeds that she is entitled to.  The house

has been on the market.  The government was aware it was on the

market.  The matrimonial court was aware it was on the market.

Everybody was aware it was on the market.  It is on the market.

It's been on the market for 11.7 million, I believe.  It hasn't

sold.  Nobody is running to destroy or take the property away.

It has been on the market at a price that independent real

estate brokers, to my understanding, recommended.  Whether it

will be sold for 10 million or 11 million, I hope, or anything

1    in between, that will be a subject for a fair market value.

2    But it is her property that they are trying to attach, not Mr.

3    Lakian's.  And she is not a defendant, she is not a party to

4    this.  And by the way, she has a judgment.  They do not.  It is

5    a very substantial issue.

6              THE COURT:  They are quite likely to have a judgment

7    in a matter of days or weeks.

8              MS. RICHMAN:  Certainly so.  But not against

9    Ms. Lakian.

10             THE COURT:  No, of course not.

11             Well, the interesting question that this all leads to,

12   I think, may be whether John Lakian's interest in the real

13   estate in his capacity as trustee, as distinguished from his

14   beneficial interest in the trust, which he owns in his personal

15   capacity, is property subject to attachment at the behest of

16   the judgment creditor of John Lakian in his individual

17   capacity.

18             MS. RICHMAN:  If the trust was terminated, which they

19   could do at any time.

20             THE COURT:  If the trust is terminated, then what

21   happens is, I imagine, that the property then becomes owned by

22   the Lakians as tenants in common in the proportion of 62 and a

23   half percent and 37 and a half percent, and then the property

24   can't be sold without both concurring, although the interest of

25   John Lakian in the property probably could be attached.  But

1    it's a fractional interest.  I think that's the way it sorts

2    out.  Isn't it?

3              MS. RICHMAN:  I agree, your Honor.

4              THE COURT:  Where does this all get us?  It gets us

5    that I'm not sure that this real estate is subject to

6    attachment for the debts of John Lakian because I'm not sure

7    whether under 6202 of the CPLR it's property against which a

8    money judgment against John Lakian could be enforced.  It's

9    held in a different capacity.  I don't know the answer.  I have

10   a good idea what the answer is, but it's untested.

11             MS. RICHMAN:  I agree, your Honor.

12             MR. RACITI:  Do you mind if I interject, your Honor?

13             THE COURT:  I don't mind.

14             MR. RACITI:  This is an interesting question that I've

15   had the liberty of exploring in depth through my research.  And

16   there is a clear answer on the EPTL Section 10-10.1.  So New

17   York law provides that where a --

18             THE COURT:  10 dash what?

19             MR. RACITI:  10.6.

20             THE COURT:  10-10.6.  Ok.  I'll try to follow along

21   here.

22             MR. RACITI:  The quote is from the EPTL.

23             THE COURT:  This is the first time estates, powers and

24   trusts law has been cited before me in 24 years.

25             MR. RACITI:  Where a creator reserves an unqualified

1  power of revocation, he remains the absolute owner of the

2  property disposed of so far as the rights of his creditors or

3  purchasers are concerned, the absolute owner of the property.

4          Here Lakian is the settler of the trust.  He is the

5  one who gave the property to the trust in a conveyance, for no

6  consideration.  He is also the sole trustee of the trust.  He

7  also retains the power to revoke the trust.  There is no

8  question that he remains the absolute owner of that property.

9          Moreover, in EPTL 7-3.1 --

10         THE COURT:  Before we get to that one, let me try to

11  stay with you.  Let's move on to your next section.  What is

12  your next section?

13         MR. RACITI:  The next section is Section 7-3.1(a),

14  which reads:  A disposition in trust for the use of the creator

15  is void as against the existing or subsequent creditors of the

16  creator.

17         THE COURT:  What does the phrase "for the use of the

18  creator" mean?

19         MR. RACITI:  It means if he retains a beneficial

20  interest in the trust -- from the perspective of a creditor, it

21  is void, and it does not provide any asset protection under New

22  York law.  It's a well-settled principle.  Both these

23  provisions would hold that the trust has no impact in terms of

24  hiding the assets from the reach of creditors for attachment or

25  execution purposes.

1          THE COURT:  How is the title to the property held

2     before it was transferred into the trust?

3          MR. RACITI:  Purely in John Lakian's name.  Only John

4     Lakian, not Andrea Lakian.  Andrea Lakian has never owned any

5     title to the property, ever.  She doesn't even have a

6     beneficial interest in the trust, assuming it wasn't void

7     because she --

8          THE COURT:  She does by virtue of the divorce decree.

9          MR. RACITI:  Which is subsequent.  Because the

10    revocable trust, she doesn't have a vested interest in the

11    property because John Lakian as trustee could revoke the trust

12    at any time, take the property back in his own name, and she

13    would have no say in it.  She doesn't have a vested interest.

14    If the trust still exists, she still does not have a beneficial

15    interest in the property.  It's not vested.

16          THE COURT:  Thank you.  Have a seat.

17          MS. RICHMAN:  Your Honor, that's simply incorrect.

18    This property was bought in one day, transferred to the trust.

19    She was named on the trust, 2002, that day.  Andrea Lakian and

20    her former husband, John Lakian, took the property together.

21    It was not his property.  It was their property.

22          THE COURT:  Who was the contract vendee at the time

23    they bought the property?

24          MS. RICHMAN:  I think it was John Lakian probably and

25    Andrea Lakian because it was a simultaneous transfer.

1              THE COURT:  That probably doesn't cut it.

2              MS. RICHMAN:  It was all in one real estate closing.

3              THE COURT:  That may be.  What did the deed say?

4              MR. RACITI:  It's exhibited, your Honor.  It says John

5     Lakian was the transfer.

6              THE COURT:  What is the exhibit?

7              MR. RACITI:  It is Exhibit F, your Honor.

8              THE COURT:  This is the wrong deed.  This is the deed

9     from Lakian to Lakian as trustee and it shows that he was the

10    contract vendor, as it were.  But I'm talking about the deed

11    from the predecessor in interest to either or both of the

12    Lakians.

13             MR. RACITI:  I guess I'm not following your Honor.

14             THE COURT:  Who owned the property before the Lakians

15    bought it?

16             MR. RACITI:  I don't know, your Honor.

17             THE COURT:  My question is, where is the deed by which

18    that owner parted with title in favor of one or more

19    titleholders?  It may be that the deed was Charlie Jones to

20    John Lakian and it may have been Charlie Jones to John Lakian

21    and Andrea Lakian, if that's the correct name.  I hope so.

22             MR. RACITI:  Wouldn't her name have to be signed off

23    on the deed from John Lakian to --

24             THE COURT:  Unless there was an intervening transfer.

25    There is some evidence, but there is a chain of title here and

 1    it's not hard to find it.

 2          Anything else, Ms. Richman?

 3          MS. RICHMAN:   The only other thing -- I want to

 4    correct a misstatement -- the trust itself, Gems II trust says:

 5    The entire beneficial interest of this trust shall be vested in

 6    the persons named in a schedule of beneficial interest of even

 7    date, signed by the trustee and the beneficiaries in the

 8    properties therewith set forth.   And those names are John

 9    Lakian and Andrea Lakian.   It is not just John Lakian.

10          THE COURT:   Counsel may have a point about the effect

11    of the EPTL.

12          Is there anything new I need to hear?   Because it's a

13    busy day.   And it's important, I understand that.   And we have

14    certainly spent some time reviewing our first year of law

15    school here.   But it's important to resolution.

16          I think the answer is, for present purposes, that I am

17    going to grant the temporary restraining order.   This is fuzzy

18    enough that I ought to freeze everything and we will sort this

19    out.   It's going to include the order of attachment.

20          Just refresh my recollection about the procedure under

21    article 62.   My memory is that where I grant without notice,

22    which is not this case, a motion to confirm has to be made

23    within five days.   What happens where I grant on notice?

24          MR. RACITI:   I don't want to misspeak, your Honor.

25    I'm sorry for guessing, guessworking here, but I don't believe

1    we have to confirm --

2            THE COURT:  That's my question to you.  Let me take a

3    look at the statute.

4            MR. RACITI:  I apologize.

5            THE COURT:  I think that may well be right.  I am

6    going to grant the TRO and I am going to grant the order of

7    attachment.  I am going to grant the order of attachment under

8    6201(3) and under 7502 of the CPLR.  I think that the

9    circumstantial evidence permits me to find a probability of

10   success on the merits of confirmation of the award, a

11   probability of success on the proposition that there is the

12   intention to sell, and to do so with intent to defraud

13   creditors.  And, in any event, referring specifically to

14   7502(c), probability of success that such a transfer would be

15   likely to render the arbitration award ineffectual in whole or

16   in part.  I view those as alternative grounds.  There is

17   certainly cause of action.  The amount demanded from the

18   defendant exceeds all counterclaims owed to the plaintiffs.

19           I have made the requisite findings.  Does anybody else

20   think I have not addressed any finding that is necessary to

21   issue this relief?

22           The record will reflect that all counsel are silent.

23           Now, this will bring on a motion for a preliminary

24   injunction because the TRO -- I take that back.  The TRO would

25   have been only pending a hearing and determination on the order

1    of attachment, which I have ruled on.  So I will cross out the

2    TRO on the ground that it is superfluous.

3        Bond undertaking.  Anyone want to address that?

4        MS. RICHMAN:  Your Honor, may I say, I understand this

5    is on notice.  We were informally given notice this morning at

6    approximately 10:00.

7        THE COURT:  You are not parties.

8        MS. RICHMAN:  Right.  That's true.  Is an attachment

9    to John Lakian's interest the defendant's interest?

10        THE COURT:  The attachment is of the property.  Now,

11    obviously, the defendant has the right to move to vacate the

12    order of attachment or to modify it and if Ms. Lakian wants to

13    intervene and seek some relief, she is welcome to try to do

14    that without in any way binding myself or suggesting that I

15    wouldn't consider it de novo in such an application before me.

16    She seems to me obviously to be in a position in which she has

17    rights that may be affected here and that she probably has a

18    right to intervene, and I would probably in any case allow her

19    to intervene and I rather suspect that the petitioner would

20    consent to intervention, right, Mr. Raciti?

21        MR. RACITI:  Yes, your Honor.

22        THE COURT:  If there is an application, it's not going

23    to be opposed with respect to intervention.  And Ms. Lakian can

24    file any application she wants if she feels she needs further

25    application.

1          What about an undertaking?

2          MR. RACITI:  I believe the CPLR provides that an

3    undertaking of $500 would be required.  I think that's

4    appropriate given the relative positions of the parties here,

5    one being the respondent who is in this position because of his

6    fraud and acts of dishonesty and the victim who, honestly,

7    can't afford a very high undertaking, given the amount of money

8    he has expended to go through the arbitration and the amount of

9    money he has lost as a result of the fraud that he has fallen

10   victim to.  This is one of the circumstances where the minimum

11   would be appropriate.

12         MR. STAVIS:  The interest of the proposed intervenor,

13   Ms. Lakian, would be a lot higher than $500, your Honor.

14         THE COURT:  But the question is this.  In what way

15   could she potentially be damaged by virtue of the attachment of

16   the property?  Go ahead.

17         MR. STAVIS:  Yes.  It would prevent the sale of the

18   property, your Honor.  And the sale of the property is

19   virtually the only thing that she received from the judgment of

20   divorce.  There was no maintenance, your Honor.  It was all

21   wrapped up in this piece of property, your Honor.

22         THE COURT:  It would prevent the sale of the property

23   absent her consent, right?

24         MR. STAVIS:  This is an order of attachment now, your

25   Honor.  Your Honor has ruled.  I understand that.  This is the

1    most scrutinized piece of property.  You have a person on

2    pretrial release.  The U.S. Attorney is after it.  Both parties

3    have to consent.  The broker has both parties.  It cannot be

4    sold out from under John Lakian.

5         THE COURT:  Let's back up.  I have granted an order of

6    attachment on the real property.  I've done it on the ground or

7    the theory that by virtue of the EPTL provisions that Mr.

8    Raciti cited, there is a substantial possibility that

9    Mr. Lakian, by revoking the trust, could wind up with the sole

10   interest in the proceeds of the sale and the right to sell.

11        MR. STAVIS:  That's not what the trust provides, your

12   Honor.

13        THE COURT:  I heard the whole argument.  I did.

14        Now, it may well be that there is a substantial

15   argument that the property shouldn't be attached, the real

16   estate, on the ground that Lakian's interest in the real estate

17   is held in a fiduciary capacity, not a personal capacity, and,

18   therefore, couldn't be applied to satisfaction of the judgment.

19   And maybe that's a ground to modify or vacate the attachment.

20        But my purpose today is to freeze the status quo and

21   you will have every opportunity to be heard on these

22   interesting issues, which are complicated and which neither

23   side recognized coming in here, although maybe Mr. Raciti did,

24   but he certainly didn't put them on the table.  I'm not

25   criticizing.  It's just the way it is.  And I had not had a

1    chance to think about it before they occurred to me in the

2    courtroom.  And so I'm in a position where I need ultimately

3    some help on this.

4           And I'm extremely sensitive to Ms. Lakian's position.

5    And it's a hard question.  What I'm really concerned about is

6    that we wake up here on Monday morning and find out, and I

7    don't mean Monday morning literally, but I wake up soon and

8    find out he is revoked, he is conveyed and the money is gone.

9    That's not an inconceivable hypothesis here.  It's maybe not

10   super likely, but it's possible.  There is enough reason to be

11   concerned that it will happen that I think in everybody's

12   interest, including Ms. Lakian's, it's very important that I

13   stop that until we sort this all out.  She certainly doesn't

14   want to wake up and find out that Mr. Raciti is right and that

15   Lakian has sold the property out from under the divorce decree.

16   That's the worst of all possible worlds for both her and the

17   plaintiff.  That's what I'm trying to accomplish.

18          Let me address the order.  I think I've got to revise

19   the order all together because it's actually no longer an order

20   to show cause because there is no motion at this point.  It is

21   an order of attachment granted on notice.  And so I will recast

22   it and, believe me, you will get expedited service if there is

23   a motion.  It's just that we all have to back up and think this

24   through.  It's complicated piece of real estate and trust law

25   mixed in with the matrimonial decree.  This will give everybody

 1 │ the chance to breathe and figure it out.

 2 │          I'll try to get that order signed before I leave

 3 │ today.

 4 │          Anything else, folks?

 5 │          MR. RACITI:  No.  Thank you, your Honor.

 6 │          THE COURT:  Thank you.

 7 │          MR. CARMEN:  Your Honor, in terms of the response to

 8 │ the petition, just informationally, that's left open.  I'm

 9 │ sorry to interrupt.

10 │          THE COURT:  It is whatever the summons says.

11 │          MR. CARMEN:  There is no date, your Honor.

12 │          THE COURT:  Doesn't the summons say 20 days?  There

13 │ had to be a summons.

14 │          MR. CARMEN:  It was a notice of petition, your Honor.

15 │          THE COURT:  Notice of petition.

16 │          MR. CARMEN:  That's it.

17 │          THE COURT:  Notice of petition.  Did you serve it?

18 │          MR. CARMEN:  That's what was filed.

19 │          MR. RACITI:  The notice of petition has not yet been

20 │ served.  It was filed yesterday before I came to chambers, your

21 │ Honor, and it's going to be served tomorrow before Mr. Lakian's

22 │ critical proceeding.

23 │          THE COURT:  I don't think you can start a federal case

24 │ without a summons.  Maybe I'm wrong.

25 │          MR. RACITI:  We checked with the clerk's office on

1    this, your Honor.

2        THE COURT:  That's always a mistake.  I'm not kidding.

3    They do a great job, but they are not Wright & Miller on

4    federal practice.  That's not their job.  You are the guy that

5    went to law school, not the poor GS11 in the clerk's office.  A

6    civil action is commenced by filing a complaint with the court,

7    not a notice of petition.

8        MR. RACITI:  I'm sorry, your Honor.  I don't mean to

9    cut you off like that.  We did file a complaint with the Court,

10   a notice of petition.  All of that was filed yesterday and I

11   thought we gave you a courtesy copy yesterday as well.  It was

12   all filed and uploaded to ECF yesterday:  Exhibits, affidavit,

13   the petition, everything.

14       THE COURT:  You have to get a summons and serve a

15   summons.  To use a technical term, without the summons, you've

16   got bupkus.

17       MS. BRONNER:  Your Honor, it's our understanding that

18   it takes 24 hours for the summons to be generated.

19       THE COURT:  Since when?

20       MS. BRONNER:  That was what was advised by my process

21   server.

22       THE COURT:  Maybe it does in your office.  Rule 4(b)

23   says:  On or after filing the complaint, the plaintiff may

24   present a summons to the clerk for signature and seal.

25       It takes you 24 hours to do that?

1          MS. BRONNER:  We apologize, your Honor.  The summons

2     is going to be served on Mr. Lakian tomorrow.

3          THE COURT:  Good plan.  I don't mean to be harsh.  For

4     God's sake, it's a federal court.  It's not 60 Centre Street.

5          MS. BRONNER:  Understood, your Honor.

6          THE COURT:  Thank you.

7                              o0o

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25