UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PANGEA CAPITAL MANAGEMENT, LLC,

                 Petitioner,

     -against-                                 16-cv-0840 (LAK)

JOHN R. LAKIAN,

                 Respondent,

     -and-

ANDREA O. LAKIAN

                 Intervenor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9-13-2017_

**OPINION**

Appearances:

        Dean G. Yuzek
        Caitlin L. Bronner
        Evan T. Raciti
        INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP
        *Attorneys for Petitioner*

        Chester R. Ostrowski
        MCLAUGHLIN & STERN, LLP
        *Attorney for Respondent*

        Judith R. Richman
        Brad E. Serlen
        SONNENFELD & RICHMAN LLP
        *Attorneys for Intervenor*

LEWIS A. KAPLAN, *District Judge*.

This is a dispute over a house.[1] In substance, petitioner Pangea Capital Management, LLC ("Pangea") seeks to enforce a money judgment against respondent John R. Lakian by executing upon certain real property of John's on Shelter Island, New York. Intervenor Andrea O. Lakian, John's former spouse, claims ownership of a portion of the property under a judgment of divorce that purported to distribute it between her and John as marital property. Before the Court are Pangea's motion for a writ of execution pursuant to Federal Rule of Civil Procedure ("FRCP") 69 and New York Civil Practice Law ("CPLR") Sections 5236 and 5239 [DI 109], and Andrea's motion [DI 113] and John's "cross-motion" [DI 116] for relief under FRCP 64 and CPLR Section 6211. These motions require the Court to determine the priority of the parties' competing claims to the subject property. The issue presented is – who gets the house?

*Background*

I.      *The Property and the Trust*

At the center of this dispute are two adjoining parcels of real property located at 6 Bootlegger's Alley and 3 Nostrand Parkway, Shelter Island, New York, where Andrea and John had their marital home (collectively, the "Shelter Island property" or the "property"). John acquired the property on December 4, 2002, and two days later transferred it to himself as trustee of a trust named the GEMS II Realty Trust ("GEMS II" or the "trust").[2] John previously had settled GEMS II

---

[1]
    In its present posture, the dispute more precisely is over the proceeds from the sale of a house. As explained more fully below, the parties agreed to the sale while the motions decided here were pending, but stipulated that the sale would not alter the *status quo* with respect to their respective claims to the property. *See* DI 106. For this reason, the opinion generally refers to the property as a piece of real estate, except when it discusses the sale as a background fact.

[2]
    *See* DI 114-8.

through a declaration of trust that named him trustee.[3]  The beneficiaries of the trust and the proportions of their beneficial interests are set forth in a separate schedule.[4]  At all relevant times John and Andrea have been fifty-percent beneficiaries of GEMS II.[5]

GEMS II has some perhaps unusual features.  The declaration of trust states that its purposes "are limited to holding the record legal title of the [Shelter Island property] for the benefit of the [b]eneficiaries" and that the trust "is intended to be merely a nominee trust, so-called, for Federal and State income tax purposes."[6]  The powers of the trustee therefore are circumscribed in some important respects.  The trustee, for example, has "no power to deal in or with" the Shelter Island property "except as directed in writing by all of the [b]eneficiaries."[7]  In acting on their commands, the trustee is not "required to inquire into the propriety of any direction received."[8]  In addition, the declaration gives the beneficiaries, "in their own right," "control of the management, operation and handling of the" property and explicitly relieves the trustee of similar duties.[9]

Yet the trustee of GEMS II retains several significant powers.  First, he or she may

---

[3]  DI 110-6, at ECF p. 2.

[4]  *Id.* at ECF pp. 2, 10-11.

[5]  *Id.*

[6]  *Id.* at ECF p 3.

[7]  *Id.* at ECF pp. 3-4.

[8]  *Id.* at ECF p. 4.

[9]  *Id.*

resign at any time and may appoint one or more additional or successor trustees.[10]  Second, the trust

"may . . . be revoked and terminated at any time by all of the then [t]rustees" by delivery of written

notice to the beneficiaries.[11]  Third, the trustee(s), together with the beneficiaries, may amend the

schedule of beneficiaries "from time to time."[12]

## II.     *The Judgment of Divorce*

Andrea and John divorced in 2015.[13]  Their judgment of divorce incorporates by

reference an agreement that settled all issues between the former spouses and provided for the sale

of the Shelter Island property.[14]  Many terms in the agreement concern the (then) anticipated sale,

the most relevant of which for present purposes states:[15]

---

[10]

    *Id.* at ECF p. 7.

[11]

    *Id.* at ECF pp. 5-6.  The power of the trustee to revoke *and* terminate contrasts with the power of the beneficiaries only to "terminate" the trust.  *Id.*  Moreover, the declaration arguably is ambiguous concerning the different consequences of termination and revocation.  Whereas the declaration provides that ownership of the Shelter Island property "shall automatically vest in the [b]eneficiaries hereof as tenants in common" upon termination, it is silent concerning the consequences of revocation.  *Id.* at ECF p. 3.

[12]

    *Id.* at ECF p. 2.  Here too the declaration arguably is ambiguous.  It provides:  "The term 'Beneficiaries' wherever used herein shall mean the persons named in the Schedule of Beneficial Interests referred to above *as it may be amended by the Trustees and the Beneficiaries* from time to time."  *Id.* (emphasis added).  The declaration thus is unclear whether the trustee and beneficiaries together must agree to amend the schedule, or whether either group may act unilaterally.  The Court, however, need not resolve this ambiguity to decide the issues presented.

[13]

    The dissolution of their marriage became final upon entry of a judgment of divorce in New York Supreme Court, New York County on June 9, 2015.  DI 110-5, at ECF pp. 3-5.

[14]

    *Id.* at ECF p. 3-4.

[15]

    *Id.* at ECF p. 18.

27.  Upon the sale of the Residence Parcel and the Vacant Parcel, the Net Proceeds of each, as hereinafter defined shall be divided so that the Wife receives 62.5% thereof plus $75,000 from the Husband's share of the Residence Parcel sale (the "Wife's Equitable Share") and the Husband Receives 37.5% thereof less $75,000 from the Husband's share of the Residence Parcel sale (the "Husband's Equitable Share").  (To the extent the Gems II Realty Trust may be amended to set forth said percentages as the beneficial interests of each of the Parties therein, the Parties will attempt to do so, but the percentages set forth in this paragraph for sharing the Net Proceeds, are derived from many factors including without limitation the completion of the equitable distribution of martial assets between them, the Wife's waiver of spousal maintenance following the sale of the Shelter Island Residence, and the Wife's waiver of certain claims for marital waste that she may have asserted in the Pending Action.)[16]

Neither John nor Andrea amended the GEMS II declaration of trust or schedule of beneficiaries to reflect the terms of the agreement.  As explained below, the anticipated sale eventually took place pursuant to an order of this Court.

*III.*     *Proceedings Before this Court*

This case first came before the Court in February 2016 on a petition by Pangea, an investment management firm, to confirm an arbitration award that it had secured against John, who had served as one of its managing members until October 2011.[17]  An arbitrator had rendered an award holding John liable to Pangea for more than $15 million in damages on claims relating to a scheme in which John had induced the firm to acquire a controlling stake in a financial services

---

[16]      Another provision delineated the spouses' possessory rights pending the sale:  "33.  Until the sale and except during any period the Shelter Island Residence is being rented the Parties shall have exclusive use and occupancy on an alternating two-week basis, whether they choose to use the residence or not."  *Id.* at ECF p. 22.

[17]      DI 4, at ECF pp. 1-2, 16.

company that came to be known as Capital L Group, LLC.[18]  After Pangea acquired Capital L Group, John had himself and a coconspirator appointed to management positions and together they took various unauthorized actions with the aim of enriching themselves at Pangea's and Capital L Group's expense.[19]  Capital L Group collapsed in 2011.  Pangea then removed John from his position and initiated the arbitration that resulted in the substantial award.

In petitioning for confirmation of the award, Pangea sought also an order of attachment in the Shelter Island property.[20]  Pangea asserted that it likely would prevail on its confirmation petition and that John likely would attempt to avoid the judgment by disposing of or otherwise encumbering the Shelter Island property as he allegedly had done with other assets.[21]  Pangea acknowledged that GEMS II, not John, held title to the property.[22]  It argued, however, that John nevertheless had the power as trustee to encumber whatever interest he did possess in the property to thwart Pangea in its efforts to collect on the award.  The Court issued the order of attachment pending resolution of the confirmation petition.[23]

Some months later, with the confirmation petition still pending, John moved to vacate

---

[18]

*Id.* at ECF p. 2, 13.

[19]

*Id.* at ECF pp. 13-16, 35, 44.

[20]

DI 6, at 2.

[21]

*Id.*  Indeed, Pangea asserts that the Shelter Island property is the *only* property outlined in its statement of claim in the arbitration that John has not conveyed beyond its reach during the course of the arbitration.  *See* DI 110, at 3.

[22]

*See id.* (declaration of GEMS II trust).

[23]

DI 6.

or modify the order of attachment.[24]  He contended that, while the property had been on the market for several years without a single offer having been made, he recently had received an offer of $8.25 million.[25]  He argued moreover that Andrea remained a beneficiary of GEMS II and was a party neither to this proceeding nor the underlying arbitration, so there was "no reason whatsoever to preclude her from realizing her share of the [n]et [p]roceeds from the proposed sale of the [p]roperty to a *bona fide* purchaser."[26]  According to John, sale of the property on the terms he proposed "would be in the best interests of all parties, including Pangea."[27]  The parties briefed the issue alongside the motions on the underlying petition.[28]

The Court heard argument on all pending motions on October 28, 2016, during which it granted Andrea's motion to intervene with respect to John's motion to vacate or modify the order of attachment.[29]  The parties – Pangea, John, and Andrea – there agreed on the record to permit the sale of the Shelter Island property and to deposit the proceeds with the Clerk of Court for a later determination of priority of their competing claims.[30]  Accordingly, when the Court later confirmed

---

[24]

DI 54.

[25]

*Id.* at ECF p. 3.

[26]

DI 55, at ECF p. 5.

[27]

*Id.*

[28]

*See* DI 54.  In opposition to Pangea's petition, John filed a motion to dismiss for lack of jurisdiction, DI 16, and a motion to vacate the arbitration award on the merits, DI 29.

[29]

DI 79, at 2.  The Court had denied John's jurisdictional motion to dismiss prior to the October 28 hearing.  *See* DI 65.

[30]

DI 79, at 4-8.

the arbitration award and denied John's motion to vacate the same, it stated that the "prior order of attachment . . . continue[d] beyond entry of judgment for petitioner until that judgment is fully satisfied" and ordered the parties to submit "a proposed order with respect to the sale of the real property as discussed at the October 28 proceedings."[31] Pangea then "docketed"[32] the judgment with the Suffolk County Clerk Records Office on November 28, 2016, and the parties continued to negotiate the terms by which the order of attachment would be modified to permit the sale of the property.[33]

The parties (after some delay)[34] submitted their proposed order, which the Court endorsed, and the house eventually was sold pursuant to its terms.[35] The order stated that it was "intended to facilitate" the sale of the property and "to maintain the status quo, and shall not impair any party's rights and priorities, if any, as they currently exist."[36] The parties stipulated also to "submit to the ongoing ancillary jurisdiction of this Court to determine any motions related to or

---

[31]

DI 77.

[32]

The Court addresses the process of "docketing" a judgment under New York law and the consequences of Pangea having done so in the following discussion.

[33]

DI 110, at 5.

[34]

According to Pangea, the discussions reached an impasse upon Pangea's "urging that the parties' interest in and priorities with respect to the net proceeds for the sale must track their respective interests and priorities with respect to the [p]roperty, itself, as they [existed] prior to any sale of the [p]roperty." DI 110, at 4. Pangea contends that Andrea took issue with this characterization, arguing that the order instead should have protected her "alleged independent property right . . . in the net proceeds, themselves . . . by virtue of her status as a beneficiary of" GEMS II. *Id.*

[35]

*See* DI 106. The net sale proceeds deposited with the Clerk of Court totaled $5,039,615.85.

[36]

*Id.* at 3.

concerning their respective rights, claims, interests, and priority interests with respect to the" net sale proceeds.[37] Those motions are the subject of this opinion.

## The Statutory Background

This case lies at the intersection of New York trust and estates, domestic relations, and procedural law. A brief overview of the relevant statutory provisions and the policies that animate them therefore is helpful.

### I. Trust Law

Pangea invokes two provisions of the New York Estate Power and Trust Laws ("EPTL") in its claim for the entirety of the Shelter Island property. The first, EPTL Section 7-3.1(a), provides that a "disposition in trust for the use of the creator is void as against existing or subsequent creditors of the creator." This provision codifies the long-established principle of New York law that a person may not avoid her creditors by placing her property in trust for her own benefit.[38] "The settlor's creditors need not allege or prove the trust is a fraudulent conveyance before they are permitted to reach the full amount of the beneficial interest retained by the settlor."[39] Rather, the "creditors can reach the maximum amount which the trustee under the terms of the trust

---

[37]      *Id.* at 4-5.

[38]      *See Dillon v. Spilo*, 250 A.D. 543, 294 N.Y.S. 876 (1st Dep't), *aff'd*, 275 N.Y. 275 (1937).

[39]      *Vanderbilt Credit Corp. v. Chase Manhattan Bank, NA*, 100 A.D.2d 544, 546, 473 N.Y.S.2d 242, 245 (2d Dep't 1984).

could pay to [the debtor] or apply for [his or her] benefit."[40] The rule effectuates New York's "public policy" against "permitting the settlor-beneficiary to tie up her own property in such a way that she can still enjoy it but can prevent her creditors from reaching it."[41]

The second provision on which Pangea relies, EPTL Section 10-10.6, stands for a similar proposition. It provides that, "[w]here a creator reserves an unqualified power of revocation, he [or she] remains the absolute owner of the property disposed of so far as the rights of his [or her] creditors and purchasers are concerned." Under this rule, a settlor of a trust who has "reserved the right to alter, amend or revoke the trust, in whole or in part, at any time," cannot "evade his [or her] creditors" through the trust structure.[42] The law accordingly treats such a trust as a nullity when addressing claims by creditors to the trust *res*.[43]

## II.     Domestic Relations Law

Andrea relies primarily on the divorce judgment. New York Domestic Relations Law ("DRL") Section 236 governs the equitable distribution of marital property upon an action for divorce in the state's courts. It defines marital property as "all property acquired by either or both spouses during the marriage . . . regardless of the form in which title is held."[44] A court in a divorce

---

40

      *Id.*

41

      *Id.* at 100 A.D.2d at 546, 473 N.Y.S.2d at 246.

42

      *In re Estate of Martin*, 259 A.D.2d 809, 811, 686 N.Y.S.2d 195, 197 (3d Dep't 1999).

43

      *See, e.g.*, *In re Bullard v. Bullard*, 185 A.D.2d 411, 412, 585 N.Y.S.2d 616, 617 (3d Dep't 1992).

44

      DRL § 236, pt. B. § 1(c).

action "shall determine the respective rights of the parties in their separate or marital property, and shall provide for the disposition thereof in the final judgment."[45] The law provides that marital property "shall be distributed equitably between the parties" according to a list of mandatory factors.[46] Parties to a divorce can avoid a court's division of marital property only by agreeing to their own.[47]

Prior to enactment of DRL Section 236, the concept of marital property was "unknown" in New York.[48] The law therefore marked a "sea-change."[49] "No longer is the matrimonial court circumscribed in its adjustment of the economic incidents of the dissolution of a marriage by the technical trappings of ownership."[50] Courts now "may disregard the form in which legal title has been held" and move beyond "traditional property concepts" in distributing martial property under the statute.[51]

Significant in this case are both the moment when a spouse's rights vest in marital property and the nature and quality of those rights. Rights to marital property are "inchoate" during

---

[45]

*Id.* § 5.

[46]

*Id.*

[47]

*See id.* (mandating judicial division "[e]xcept where the parties have provided in an agreement for the disposition of their property").

[48]

*McDermott v. McDermott,* 119 A.D.2d 370, 378, 507 N.Y.S.2d 390, 396 (2d Dep't 1986).

[49]

*Id.*

[50]

*Id.*

[51]

*Id.* (internal quotation marks omitted).

the marriage and through the initiation of divorce action.[52]  Only upon entry of a judgment of

divorce do those "inchoate rights become actual ownership interests."[53]  Moreover, awards under

DRL Section 236 are not limited in form or substance to support payments or equitable liens on the

property of one spouse in favor of the other.  Rather, equitable distribution can establish true

property rights under state law.[54]  Indeed, the Second Circuit has held that a separation agreement

executed as part of a divorce proceeding "can serve as a conveyance from the marital estate to

divorcing individuals within the meaning of New York Real Property Law [Section] 290(3), which

defines 'conveyance' to include 'every written instrument, by which any estate or interest in real

property is created.'"[55]

## III.    *Priority Among Judgment Creditors*

The final statutory piece to this puzzle is CPLR Section 5203, which governs the

priority of claims among judgment creditors to a debtor's real property.  Under that statute, a

---

[52]

*McDermott*, 119 A.D.2d at 379, 507 N.Y.S.2d at 397.

[53]

*Id.  See Musso v. Ostashko*, 468 F.3d 99, 106 (2d Cir. 2006) (noting that "entry of the judgment is critical, under New York law, to cementing the spouse's interest in the property").

[54]

*See McDermott*, 119 A.D.2d at 381, 507 N.Y.S.2d at 398 ("These days the wife's right to 'share' in the pension is effectuated as the grant of a property right, not alimony.").  Trial courts making an equitable distribution of a martial residence have four principal options: (1) to award sole title to one spouse, (2) to award exclusive use and occupancy to one spouse, (3) to require or permit one spouse to buy out the equitable share of the other, or (4) to order the residence sold with the proceeds divided between the parties.  *See* 48A N.Y. Jur. 2d *Domestic Relations* § 2764 (2017).  Of course, divorcing spouses who distribute marital property between themselves by agreement may elect to distribute real estate in the manner of their choosing.

[55]

*Commodity Futures Trading Comm'n v. Walsh*, 618 F.3d 218, 227-28 (2d Cir. 2010).

"judgment does not give rise to a lien prior to entry, or 'docketing,' of the judgment with the county clerk in the county where the real property is located."[56]  "Docketing" refers to a process by which "the judgment is recorded by the clerk in books listing the surnames of judgment debtors alphabetically."[57]  In this way, New York law determines the priority of claims by competing judgment creditors "on the basis of a pure horse race: the first to docket his judgment in the county where the reality is located has full rights in the property, unless there is a surplus."[58]  This bright-line rule serves an important notice function and permits "the lienholder to rely on its interest in the property."[59]

*Discussion*

Pangea asserts that a combination of these rules gives it priority over Andrea's competing claim to the Shelter Island property.[60]  Its argument proceeds in two steps.  First, Pangea

---

[56]

   *Musso*, 468 F.3d at 106 (citing CPLR § 5203(a)).  The statute reads:

   > (a) Priority and lien on docketing judgment. No transfer of an interest of the judgment debtor in real property, against which property a money judgment may be enforced, is effective against the judgment creditor either from the time of the docketing of the judgment with the clerk of the county in which the property is located until ten years after filing of the judgment-roll, or from the time of the filing with such clerk of a notice of levy pursuant to an execution until the execution is returned . . . .

[57]

   *Musso*, 468 F.3d at 106.

[58]

   *Id.* (internal quotation marks omitted).

[59]

   *Id.*

[60]

   As stated above, the parties stipulated that the sale of the Shelter Island property would not disturb the *status quo* or otherwise alter their rights to the property.  In consequence, to whatever extent it would make a difference, the Court addresses the competing claims to the net proceeds of the sale as if they were claims upon the real estate itself.

contends that it holds the only properly-recorded lien against John's interest in the property by virtue of having docketed its judgment against him in accordance with CPLR Section 5203. According to Pangea, the judgment of divorce that would distribute the bulk of the sale proceeds to Andrea is no different than any other judgment and therefore is subject to the bright-line rule in Section 5203. And because it is undisputed that Andrea has not docketed the judgment of divorce, Pangea takes first.

Second, Pangea argues that John's interest in the property is not limited to his fifty-percent share as beneficiary of GEMS II or his lesser share under the judgment of divorce, but rather extends to the entire property. That is so, Pangea maintains, because John as trustee of GEMS II has the power to revoke the trust, which makes him the "absolute owner" of the trust *res* as far as the rights of creditors are concerned under Section EPTL 10-10.6, and because GEMS II is a self-settled trust for which John is a beneficiary, rendering it void as against creditors under EPTL Section 7-3.1(a).

Andrea counters that Section 5203 does not apply in this case because she is not a judgment creditor, but rather has an independent interest in the property under the judgment of divorce.[61] She thus argues that she is entitled to her share of the net sale proceeds as provided in the agreement incorporated into the judgment of divorce. John supports Andrea in her arguments and does not challenge Pangea's claim to his share of the net sale proceeds, whatever that share may

---

[61] Andrea asserts as a second basis for her independent ownership interest in the property that GEMS II is either a "nominee trust," which is an arrangement unique to Massachusetts law, or a passive trust under New York law. *See* DI 115, at 4-13. The Court need not and does not address this alternative argument.

be.[62]

For the following reasons, the Court holds that Andrea's interest in the Shelter Island property vested upon entry of the judgment of divorce, which predated Pangea's judgment against John. Pangea as judgment creditor may not execute upon a portion of the property in which John ceased to have an interest prior to Pangea securing its judgment against him and to which John lacks any enforceable claim.

## I.    *Jurisdiction and Procedural Posture*

In light of the complicated path by which these motions arrived before the Court, the Court begins by addressing issues of jurisdiction and procedural posture before discussing the merits.[63]

The Court had subject matter jurisdiction over Pangea's petition to confirm its arbitration award against John, and John's several motions to vacate it, because the award rested in part on a claim under the federal Racketeer Influence Corrupt Organizations Act.[64, 65]  As part of

---

[62]

DI 117, at ECF p. 6.  In his cross-motion, John moves also for attorneys' fees and costs incurred in connection with the sale to be paid out of his share of the net sale proceeds.  *See id.* at 6-8.  The Court addresses this request at the conclusion of its opinion.

[63]

As noted above, the parties have consented to the Court's ancillary jurisdiction over these motions as part of the their agreement to modify the Court's order of attachment to permit the sale of the property.  Of course, their consent does not confer upon the Court subject matter jurisdiction that it otherwise lacks.

[64]

18 U.S.C. § 1961 *et seq.*

[65]

*See Doscher v. Sea Port Grp. Sec., LLC*, 832 F.3d 372, 388 (2d Cir. 2016) ("[E]xistence of federal-question jurisdiction over [a Federal Arbitration Act] petition turns on whether the district court would possess jurisdiction over the underlying dispute under the standards of § 1331.").

those proceedings, Pangea successfully moved under FRCP 64 and, by incorporation, CPLR Sections 6201 and 7502(c), for the order of attachment against the Shelter Island property.[66] Although the parties stipulated to the modification of the order of attachment to permit the sale of the property,[67] the order remains in force as to the sale proceeds.[68]  The Court's jurisdiction over the case likewise continues.[69]

The parties' motions are a proper mechanism for determination of their rights in the property.  The present motions are Pangea's attempt under FRCP 69 to enforce its federal court judgment and Andrea's opposition to the same.  FRCP 69 provides that a "money judgment is enforced by a writ of execution," the procedure for which "must accord with the procedure of the state where the court is located."[70]  The parties cite two different CPLR provisions as governing this case.  Pangea relies on Section 5239, which provides that, "[p]rior to the application of property or debt" to satisfy a judgment, "any interested person may commence a special proceeding against the judgment creditor or other person with whom a dispute exists to determine rights in the property."  Andrea invokes Section 6221, which states that, "[p]rior to the application of property or debt to the

---

[66]

DI 6.

[67]

DI 106.

[68]

*See* DI 87; *see also* CPLR § 6224 ("An order of attachment is annulled when the action in which it was granted abates or is discontinued, or a judgment entered therein in favor of the plaintiff is fully satisfied, or a judgment is entered therein in favor of the defendant.").

[69]

*See, e.g*, *Peacock v. Thomas*, 516 U.S. 349, 356 (1996) (explaining that ancillary jurisdiction will lie "in subsequent proceedings for the exercise of a federal court's inherent power to enforce its judgments").

[70]

FRCP 69(a)(1).  State procedural law governs unless a federal statute applies, *id.*, which is not the case here.

satisfaction of a judgment, any interested person may commence a special proceeding against the plaintiff to determine the rights of adverse claimants to the property or debt."

Both Section 5239 and 6221 point in the same direction – a "special proceeding" to determine the parties' rights in the Shelter Island property. A special proceeding is a feature of New York law that has no direct federal analogue.[71] "Nearly every court in the Second Circuit to consider the issue, however, has held that parties can bring a motion under FRCP 69(a), rather than instituting a special proceeding under New York state law."[72] What is more, these parties have consented to the Court's determination of their competing claims, even if they rely on separate CPLR provisions. The Court thus concludes that it continues to have jurisdiction over this case and that the present motions properly have been made under FRCP 69.[73]

## II. *Extent of Andrea's Interest in the Property*

Pangea's claim to the entirety of the Shelter Island property rests on the premise that this is a battle between two judgment creditors. For this proposition, Pangea relies exclusively on the Second Circuit's *Musso* decision. But *Musso* does not control this case and actually undermines Pangea's position.

*Musso* involved a priority dispute over certain marital property between Tanya

---

[71]

    *See, e.g.*, *Mitchell v. Lyons Prof'l Servs., Inc.*, 727 F. Supp. 2d 120, 122-23 (E.D.N.Y. 2010).

[72]

    *SEC v. Vuono*, 13-MC-405(JFB), 2013 WL 6837568, at *3 (E.D.N.Y. Dec. 26, 2013) (collecting cases) (internal quotation marks omitted).

[73]

    *See generally SEC v. Elliott*, 180 F. Supp. 3d 230 (S.D.N.Y. 2016) (deciding competing claims to a debtor's property made by SEC as judgment creditor and debtor's spouse in similar procedural posture).

Ostashko and the trustee of her former spouse's bankruptcy estate.[74]  The court stated that the issue before it was "relatively straightforward:  When marital assets have been awarded to the wife in a state court matrimonial proceeding, are those assets nevertheless part of the husband's bankruptcy estate if a Chapter 7 petition is filed after the state court's decision but before the state court judgment is entered?"[75]  The case thus turned on the precise moment when Tanya's rights in the marital property vested – upon the date of the state court's decision or its later entry of judgment.

The district court, in ruling for Tanya, held that her interest in the property vested on the date of the matrimonial court's decision and that the later entry was "merely ministerial."[76]  The Second Circuit interpreted New York law as compelling the opposite conclusion because, "as between a spouse and a third party (such as a judgment lien creditor), entry of judgment is critical, under New York law, to cementing the spouse's interest in the property."[77]  The court therefore held that "[b]ecause Tanya's interest in the property did not completely vest until after the involuntary petition was filed the property is part of the bankruptcy estate."[78]

*Musso* does not control this case because Andrea's judgment of divorce from John was entered *before* Pangea obtained its judgment against him.  Indeed, with the significance it places

---

[74]    *See* 468 F.3d at 102-04.

[75]    *Id.* at 102.

[76]    *Id.* at 107 (internal quotation marks omitted).

[77]    *Id.* (emphasis omitted).

[78]    *Id.* at 108.

on the date of entry,[79] *Musso* seems an unfavorable decision for Pangea because it implies that Tanya would have prevailed had her judgment of divorce been entered prior to the bankruptcy filing. Pangea, however, relies on other statements in the opinion.

The *Musso* court presented as the first of four premises underlying its holding that "under New York law an equitable distribution award is a remedy, and the enforcement of that remedy is no different than the enforcement of any other judgment."[80] It went on to state:

> In that sense, an equitable distribution award is similar to the imposition of a constructive trust: It is a remedy available to the courts to ensure that traditional title principles do not prevent the courts from achieving equity between the parties to an action. A spouse without legal title has no interest in marital property prior to obtaining a judgment creating such an interest, for the concept of marital property only exists "as an ancillary remedy to the dissolution of a marriage."[81]

Although presented as a premise from which its holding followed, the court's observations on the nature of equitable distribution are in fact *dicta*. And while the Court gives them respectful and careful attention, they do not control its decision in a case in which the issue they address actually is presented.[82] That perhaps is especially so where the point in question is one of state law, on which

---

[79]

    The Second Circuit and district courts in the circuit since have recognized that *Musso* relied on the date of entry of the judgment of divorce. *See United States v. Butler*, 543 F. App'x 95, 96-97 (2d Cir. Nov. 22, 2013) (summary order) (citing *Musso* for the proposition that "New York state law does not create any interest in marital property *prior to a judgment* dissolving the marriage" (emphasis added)); *Flythe v. Astrue*, 10-cv-9069(NM), 2012 WL 38927, at *3 (S.D.N.Y. Jan. 6, 2012) (characterizing the *Musso* court as having "rel[ied] on the *date of entry* of the divorce" (emphasis added)).

[80]

    *Id.* at 102.

[81]

    *Id.* at 105-06 (quoting *Leibowits v. Leibowits*, 93 A.D.2d 535, 543, 462 N.Y.S.2d 469, 473 (2d Dep't 1983) (O'Connor, J., concurring)).

[82]

    *E.g., United States v. Bell,* 524 F.2d 202, 206 & n.4 (2d Cir. 1975) (quoting with approval *Perlman v. Timberlake,* 172 F. Supp. 246, 253 (S.D.N.Y. 1959)); *cf. United States v. Oshatz,* 912 F.2d 534, 540-41 (2d Cir. 1990).

a federal court is obliged to apply the state rule of decision, and there are indications that the state's highest court would not adopt the Circuit's *dicta* were the issue presented to it.[83]

*Musso* turned on the conclusion that Tanya possessed no right to the marital property prior to entry of the judgment of divorce. The bankruptcy trustee thus already had acquired and perfected its lien against the property at issue by the time the matrimonial court purported to transfer it to Tanya. *Musso*'s statement of the law on this critical point – that "a spouse without legal title has no interest in marital property prior to obtaining a judgment creating such an interest"[84] – finds abundant support in New York case law.[85] Most importantly, application of that rule completely resolved the case. On the other hand, the court's statement that "an equitable distribution award is a remedy, and the enforcement of that remedy is no different than the enforcement of any other judgment" and its analogy of equitable distribution to a constructive trust, were not necessary to its holding and rest on decidedly shakier ground.[86]

Indeed, New York courts have either disagreed with those aspects of *Musso* or otherwise have not applied them in cases like this one – a case in which a judgment of divorce is entered *before* the creditor obtains his or her judgment against the debtor-spouse. The court in

---

[83]

    *See Chevron Corp. v. Donziger,* No. 11-cv-649 (LAK), 2013 WL 3879702, at *1 (S.D.N.Y. July 29, 2013).

[84]

    *Musso*, 468 F.3d at 106.

[85]

    *See, e.g.*, *McDermott*, 119 A.D.2d at 378-80, 507 N.Y.S.2d at 397-98.

[86]

    *Musso*, 468 F.3d at 102, 105. These statements perhaps are an accurate description of a spouse's rights to marital property prior to the entry of a judgment of divorce and there likely would be a forceful argument under *Musso* for a different resolution here if the judgment of divorce had not been entered prior to the proceedings in this Court. Of course, this is not such a case and the Court thus does not reach the issue.

*Darling v. Darling*,[87] for example, considered competing claims to a condominium[88] by a judgment creditor of a debtor-spouse and the debtor's former wife.[89]  The order of events was similar to that in this case.  The judgment of divorce distributing the property to the wife had been entered *before* the judgment against the debtor-spouse had arisen, but the creditor had perfected its interest under CPLR Article 52 whereas the wife had not.[90]  In distinguishing *Musso*, the court rejected the analogy in that case between divorced spouses and judgment creditors, holding that "there is a material difference between the usual judgment creditor, seeking to collect a money judgment from any property owned by the judgment debtor, and the distributee under a divorce judgment, seeking possession of specific property awarded from the marital estate."[91]  The court, relying on the well-established rule that rights to marital property vest upon entry of the judgment of divorce, concluded that wife was more like a "transferee" than a judgment creditor.  The court thus ruled in favor of the wife because her interest had vested before the creditor had obtained its judgment against the debtor spouse.[92]

---

[87]

22 Misc.3d 343, 869 N.Y.S.2d 307 (Sup. Ct. Kings Co. 2008).

[88]

In accordance with New York law, the *Darling* court treated shares in the condominium as personal property, not real property.  *See* 22 Misc.3d at 348, 869 N.Y.S.2d at 312-13.  Pangea argues that this fact makes *Darling* inapposite.  *See* DI 123, at ECF pp. 32-33.  But the court's classification of the property at issue as real or personal does not bear on its analysis of the interplay of New York DRL and creditor rights law.

[89]

22 Misc.3d at 346-7, 869 N.Y.S.2d at 311-12.

[90]

22 Misc.3d at 354, 869 N.Y.S.2d at 316-17.

[91]

22 Misc.3d at 354, 869 N.Y.S.2d at 317.

[92]

*See* 22 Misc.3d at 356, 869 N.Y.S.2d at 318 ("The result here is that, because [the debtor-spouse's] interest in the Coop is deemed to have been transferred to [the wife] well before [the judgment creditor] delivered execution on her judgment against [the debtor-spouse],

The court in *Rodriguez v. Sepe*[93] reached the same conclusion on similar facts. The assets in dispute were different – shares of a company owned by the debtor-spouse that were distributed to the wife under an agreement incorporated into a judgment of divorce – but the order in which the various claims arose was the same as here and in *Darling*.[94] As in *Darling*, the court rejected the framing of the case as "a battle of the judgment creditors."[95] Because the judgment of divorce was entered before the judgment against the debtor-spouse arose, the stock distributed to the wife could not "be considered as part of [the debtor-spouse's] property for the purposes of satisfying plaintiffs' judgment against him."[96] Again, as in *Darling*, the wife prevailed over a judgment creditor of her former spouse because the judgment of divorce already had extinguished the former spouse's interest in the property that the creditor sought to execute upon.

In this Court's view, these courts were correct to reject the *Musso dicta* because treating a divorced spouse as a transferee more accurately reflects New York law on equitable distribution than does *Musso*'s conception of spouse as judgment creditor.[97] As explained above, DRL 236 mandates that a court identify and distribute between the divorcing spouses all marital

---

the Coop cannot be reached by [the judgment creditor] under Article 52.").

[93] 29 Misc.3d 1011, 908 N.Y.S.2d 854 (Sup. Ct. West. Co. 2010).

[94] 29 Misc. 3d at 1015, 908 N.Y.S.2d at 857.

[95] 29 Misc. 3d at 1018, 908 N.Y.S.2d at 859.

[96] 29 Misc. 3d at 1019, 908 N.Y.S.2d at 860.

[97] *Cf. Kaplan v. Kaplan*, 82 N.Y.2d 300, 305 (1993) (holding that "[e]quating the rights of the spouse and dependents with those of any other creditor for purposes of applying the anti-assignment rule is no longer justified" in light of the "revolutionary enactment of the Equitable Distribution Law in 1980").

property.[98]  The law reflects the now "well settled" principle that, in New York, "marriages are considered to be economic partnerships, and, upon dissolution, the partnership assets are to be equitably distributed."[99]  Equitable distribution therefore is not like a remedy; it is like a final settling of accounts.  The rights of the spouses may be set forth in a judgment (or, in this case, an agreement incorporated into a judgment),[100] but that does not make each spouse a judgment creditor of the other with regard to assets held separately during the course of the marriage and distributed as marital property upon its dissolution.[101]  Rather, "inchoate rights" to marital property "become *actual ownership interests* by virtue of equitable distribution judgments."[102]  It therefore is not accurate to assert, as *Musso* did in *dicta*, that an equitable distribution award is "similar to the imposition of a constructive trust"[103] when the central innovation of equitable distribution was to "disregard the form in which legal title has been held and distribute the marital property on the basis

---

[98]

    *See* DRL § 236, pt. B. § 5.

[99]

    *Peterson v. Golberg*, 180 A.D.2d 260, 265, 585 N.Y.S.2d 439, 442 (2d Dep't 1992).

[100]

    New York law does not distinguish between property distributed by judicial order and that distributed by agreement between divorcing spouses incorporated into a judgment of divorce.  *See Kaplan*, 82 N.Y.2d at 307.

[101]

    Pangea resists this conclusion by citation to DRL § 244, which provides the procedure by which one spouse owed child support may seek a judgment of the court declaring the other in arrears, and cases applying that provision.  *See* DI 123, at ECF pp. 28-30.  Its reliance is misplaced.  A spouse in those situations does not seek possession of specific assets awarded under an equitable distribution, as Andrea does.  Rather, such a spouse seeks delinquent support payments.  It may be appropriate to treat a spouse who seeks an additional court order of delinquency as a judgment creditor of the delinquent spouse.  The Court, however, need not reach that issue because Andrea does not rely on § 244 nor does she seek support payments from John.

[102]

    *McDermott*, 119 A.D.2d at 379, 507 N.Y.S.2d at 397 (emphasis added).

[103]

    *Musso*, 468 F.3d at 105.

of listed equitable factors, something that could not have been done directly under prior law, and could not be done effectively by the employment of other traditional legal concepts *such as constructive trusts.*"[104]

The *Musso dicta* conflict also with decisions of bankruptcy courts in this district, where disputes between judgment creditors and divorced spouses often arise. Bankruptcy courts applying New York law long have recognized that "[e]quitable distribution proceedings . . . affect title to and possession of property of the estate."[105] Accordingly, property held in the name of a debtor-spouse that is awarded to a non-debtor spouse as part of an equitable distribution prior to the filing of a bankruptcy petition *does not* become part of the debtor's bankruptcy estate.[106] That is true even if the divorcing spouses fail to transfer the disputed property to the non-debtor spouse, leaving it in the possession of the debtor spouse and title unchanged at the time of the bankruptcy filing.[107] If it were the case, as *Musso* suggested, that a distributee under a judgment of divorce is like a judgment creditor, then his or her claim to the property would be junior to the bankruptcy trustee's "judicial lien on all property in which the debtor has any interest that could be reached by a creditor"

---

[104]

    *McDermott*, 119 A.D.2d at 378, 507 N.Y.S.2d at 396 (emphasis added).

[105]

    *In re Cole*, 202 B.R. 356, 360 (Bankr. S.D.N.Y. 1996).

[106]

    *See, e.g.*, *In re Greenwald*, 134 B.R. 729, 731 (Bankr. S.D.N.Y. 1991). In that case, a matrimonial court had awarded to the wife a 50% interest in the shares of the husband's employee stock ownership plan that qualified as marital property, a cash award from funds held by the husband, and a transfer of a sum of money from the husband's individual retirement account. *Id.* at 729-30. The husband then filed for bankruptcy before any payments were made under the judgment of divorce. *Id.* at 730. Nevertheless, the court held that the property was not part of the husband's estate. *Id.* at 731.

[107]

    *See generally id.*

should the distributee fail to perfect his or her claim under CPLR Article 52.[108]

But that is not how bankruptcy courts have handled these situations. A spouse awarded property through equitable distribution is not required to execute upon (or docket a judgment awarding) the property in question under Article 52 to preserve his or her right to the property against the bankruptcy trustee or creditors of his or her former spouse. Neither is required because equitable distribution from the debtor to the non-debtor spouse extinguishes the interest of the debtor that the creditors seek to execute upon, regardless of the form in which the property was held prior to (or immediately after) the equitable distribution.

In sum, *Musso* does not control this case in consequence of the fact that Andrea and John's judgment of divorce was entered before Pangea obtained its judgment against John. What is more, this case is not a battle of the judgment creditors under CPLR 5203.[109] The fact that Pangea docketed its money judgment against John, whereas Andrea never docketed her judgment of divorce, therefore is irrelevant.[110] The statements in *Musso* on which Pangea relies for a contrary

---

[108]

*Musso*, 468 F.3d at 104.

[109]

As explained above, CPLR 5203 provides a bright-line priority rule as amongst competing judgment creditors who seek to transform general money judgments against a debtor into liens on a specific piece or pieces or the debtor's property. That rule thus encompasses Pangea's claim, but not Andrea's because Andrea does not have a money judgment against John.

[110]

In its reply, Pangea goes some distance towards acknowledging that Section 5203 by its own terms does not apply to judgments of divorce. *See* DI 123, at ECF p. 30. It there argues for the first time that Andrea had to convert the judgment of divorce into a money judgment against John and then docket it under Section 5203 in order to secure her rights in the property. *See id.* This is a somewhat galling argument for several reasons.

First, it ignores the fact that the Court analyzes the present motions as if they were claims to the property prior to the sale. Indeed, Pangea was adamant about including that condition in the parties' stipulation. *See* DI 110, at 4. But if it were the case, as Pangea argues, that Andrea lacks any interest in *the property* (as opposed to the sale proceeds) and could claim priority in the proceeds only by awaiting the sale, then suing John for her share, and finally

conclusion are *dicta*. The Second Circuit has not relied upon those statements in any subsequent decision,[111] nor have New York courts adopted them as accurately stating the law. In the Court's view, they would not be adopted by the New York Court of Appeals were the issue presented to it.[112]

In light of the foregoing, the Court concludes that New York law compels the conclusion that the judgment of divorce between Andrea and John (and the agreement it incorporated) fundamentally altered their respective rights to the Shelter Island Property upon its entry. The agreement acknowledges that John had acquired the deed to the property as trustee of GEMS II, that the terms of GEMS II gave John and Andrea fifty percent beneficial interests in it, but also that the property is "marital property subject to equitable distribution."[113] It thereafter

---

docketing that money judgment, then it would be impossible for Andrea to prevail if the Court treated these motions as though they were claims on the pre-sale property. Fortunately for Andrea, the law does not place her in such an unworkable position.

Second, the argument raises the possibility of bad faith on Pangea's part because Pangea caused the particular order of events in this case. While the parties were negotiating the stipulation, Pangea wrote to the Court to urge it to enter judgment for Pangea because an unrelated victim of John's fraud was proceeding to judgment against him in a New York court. *See* DI 71. The Court then entered judgment, DI 87, which Pangea promptly docketed. In light of the fact that Pangea now asserts that Andrea lost out on any claim to the sale proceeds at that moment, one could infer that Pangea's letter to the Court was part of a strategy to secure a superior claim before the property was sold. In any event, the Court does not rely on any equitable considerations because Pangea's legal arguments fail.

[111]

Indeed, a later decision by the Second Circuit suggests that the court would not adopt the *Musso* dicta as a holding. The court held in *Walsh* that a distribution from one spouse to another under a judgment of divorce effectuated a transfer of ownership in and of itself. *See* 618 F.3d at 227-28. The court did not suggest that the distributee under the judgment held only a lein against the property such that she must execute upon the property in order to secure her rights. *See id.* Rather, the separation agreement incorporated into the judgment of divorce "create[d] an interest in the funds for her individually." *Id.* at 228.

[112]

This Court, unlike the Second Circuit, "do[es] not have the authority to certify questions to the New York Court of Appeals." *O'Mara v. Town of Wappinger*, 458 F.3d 693, 698 n.7 (2d Cir. 2007).

[113]

DI 110-5, at ECF p. 15.

created in the parties rights in and obligations with respect to the property that are different in significant respects from those that they held under the GEMS II declaration of trust. For example, the agreement acknowledges that the Shelter Island property already was listed for sale and required the parties to take various actions to facilitate its sale.[114] It altered also the parties' possessory rights pending the sale, giving John and Andrea "exclusive use and occupancy on an alternating two-week basis."[115]

Finally, and most important for present purposes, the agreement changed the parties' interests in the net proceeds of the impending sale. Whereas John and Andrea under GEMS II would have split the sale proceeds equally, Andrea became entitled to 62.5 percent of the proceeds plus $75,000 from John's share under the agreement.[116] Significantly, the agreement states that to

---

[114]

See id. at ECF pp. 15-16 (requiring, for example, John to execute any documents necessary to effectuate the transfer of title to the third party purchaser and both parties to make the residence available to brokers).

[115]

Id. at ECF p. 22. The assignment of these rights alone refutes Pangea's assertion that Andrea lacked any right under the agreement to the property itself and only the "right to receive payment" from the sale. See DI 123, at ECF p. 9. Pangea thus misreads the agreement and misunderstands its effect on the parties' rights to the property.

Moreover, this argument ignores the fact that, under New York law, equitable distribution awards of marital property contingent on a later event like a sale can provide the distributee with an immediate ownership in the property upon entry of the judgment of divorce. McDermott, for example, involved an award to a wife of a portion of her former husband's pension that was to be paid upon his retirement or death. 119 A.D.2d at 376, 507 N.Y.S.2d at 395 (describing award to wife as "an interest in the pension contract that permits her to share in the payments as made and in any further distribution after her husband's death"). One could describe such an interest as the "right to receive payment" entirely contingent on the husband's death. The court, however, found the wife had an "actual ownership interest" sufficient to restrict the husband's choice of disbursement options during his life so as to prevent him from leaving her with no money upon his death. See 119 A.D.2d at 381, 507 N.Y.S.2d at 398. The wife did not have to wait until the contingency occurred (or did not occur) to sue her former husband for her "right to receive payment" because the equitable distribution gave her an immediate, enforceable right in the pension as property. See id.

[116]

DI 110-5, at ECF p. 18.

the extent the GEMS II declaration "may be amended to set forth said percentages as the beneficial interests of each of the [p]arties therein, the [p]arties will attempt to do so," but did not require it.[117] The stated reason for not requiring the change is that the division of proceeds "are derived from many factors including without limitation the completion of the equitable distribution of martial assets."[118] John and Andrea thus recognized, regardless of the terms of GEMS II, that the terms of their agreement would control upon entry of the judgment of divorce.

In sum, during her marriage to John and through the initiation of the divorce proceedings, Andrea's rights to the Shelter Island property were limited to those she held under the GEMS II declaration of trust. Whatever additional interest she had in the property by virtue of it being marital property remained inchoate and unenforceable against John or his creditors. But, upon entry of the judgment of divorce, her rights to and interest in the marital property vested according to the terms of the agreement. Although the GEMS II declaration continued to list Andrea as only a fifty-percent beneficiary, that no longer was an accurate reflection of her interest in the property. Moreover, Andrea's rights vested before Pangea secured its judgment against John. Finally, CPLR Section 5203 does not subordinate Andrea's claim to Pangea's because New York law does not treat Andrea as a judgment creditor of her former spouse for assets awarded to her under the judgment of divorce.

III.    *Impact of the Judgment of Divorce on Pangea's Claim*

In light of the preceding discussion, the EPTL provisions on which Pangea relies do

---

[117]    *Id.*

[118]    *Id.*

not support its claim to the entirety of property. As explained above, EPTL Section 7-3.1(a) permits Pangea to reach the maximum amount of the trust property that John as trustee could pay to himself or apply for his own benefit.[119] Pangea argues that the maximum amount is the entire property because John as sole trustee has the power to revoke the trust, leaving him as the absolute owner.[120] That may or may not be the best reading of the GEMS II declaration,[121] but it entirely ignores the judgment of divorce. Regardless of the extent of John's power over the property under GEMS II, after entry of the judgment of divorce he no longer could obtain either absolute ownership of the real estate prior to the sale or the entirety of the sale proceeds thereafter. Any attempt to obtain such control would have contravened the judgment of divorce. That judgment, of course, gave Andrea certain immediate possessory rights, provided for the sale of the house, and awarded Andrea the bulk of the proceeds of the impending sale. In consequence, the maximum portion of property that John could reach for his own benefit is the amount provided in the agreement between him and Andrea and incorporated into their judgment of divorce. John does not contest Pangea's execution on that interest.

Nor does EPTL Section 10-10.6 assist Pangea. As explained above, that provision treats as a nullity self-settled trusts in which the settlor retains an unqualified right to revoke. In those instances, a creditor of the settlor may execute upon the trust *res* as if the settlor were the absolute owner. Again, regardless of the terms of GEMS II, John no longer was the absolute owner of the Shelter Island property after entry of the judgment of divorce. Section 10-10.6 thus does not

---

[119]

    *See Vanderbilt*, 100 A.D.2d at 546, 473 N.Y.S.2d at 245.

[120]

    DI 111, at ECF p. 18.

[121]

    The Court need not and does not decide this issue in ruling on the present motions.

allow Pangea to reach the entirety of property. This makes sense because the policy behind Section 10-10.6 is to prevent debtors from evading their creditors through a trust structure when, at any time, they could revoke the trust and obtain absolute ownership.[122] That policy is not implicated here because Andrea still would be entitled to possession and to her share of the net sale proceeds under the judgment of divorce even if John were to revoke GEMS II.

In sum, John does not oppose Pangea's execution upon his interest in the Shelter Island property. Under either EPTL provision that Pangea cites, that interest is limited to 37.5 percent of the net sale proceeds less $75,000. In consequence, that is the amount that Pangea rightfully may claim as partial satisfaction of its judgment against John.[123]

IV.     John's Request for Costs and Fees

John argues that because his law firm, McLaughlin & Stern LLP, "has expended considerable time and effort" in overseeing the sale of the Shelter Island property, the firm is entitled to recover fees and costs deducted from John's share of the sale proceeds prior to distribution to Pangea.[124] Pangea opposes this request, relying on the stipulation between the parties that modified the Court's order of attachment to permit the sale.[125]

That stipulation, signed by all parties, precludes John's request. The stipulation set

---

[122]

   *See Martin*, 259 A.D.2d at 811, 686 N.Y.S.2d at 197.

[123]

   Because this is the amount to which Andrea argued that she is entitled, the Court does not reach her alternative argument that equity principles favor her position.

[124]

   DI 117, at ECF pp. 6-8.

[125]

   DI 123, at ECF pp. 41-43.

forth the payments and expenses that could be deducted from the purchase price in calculating the net sale proceeds that would be deposited with the Clerk of Court.[126] Expenses of the type that John seeks to deduct could have been, but were not, included in the bargain struck by the parties. His request therefore fails.

*Conclusion*

For the foregoing reasons, Pangea's motion for a writ of execution [DI 109] is granted to the extent that Pangea is entitled to execute on 37.5 percent less $75,000 of the net sale proceeds previously deposited with the Clerk of Court and denied in all other respects. Andrea's motion [DI 113] and John's cross-motion [DI 116] also are granted to the extent that Andrea is entitled to a portion of the net sale proceeds of 62.5 percent plus $75,000 and denied in all other respects. The Clerk of Court is instructed to disburse the funds currently in its possession in accordance with the Court's order.

SO ORDERED.

Dated:        September 13, 2017

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[126]    *See* DI 114-9, at ECF pp. 6-7.